[Cite as *Sivinski v. Kelley*, 2011-Ohio-2145.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 94296

---

## JOHN A. SIVINSKI

PLAINTIFF-APPELLANT

vs.

## LYNN ARKO KELLEY, ET AL.

DEFENDANTS-APPELLEES

---

### JUDGMENT:
### AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

---

Civil Appeal from the
Cuyahoga County Common Pleas Court
Case No. CV-595064

**BEFORE:** Boyle, P.J., Sweeney, J., and Cooney, J.

**RELEASED AND JOURNALIZED:** May 5, 2011

**ATTORNEYS FOR APPELLANT**

John A. Sivinski
Brian R. Herberth
Brian J. Smith
Sivinski, Smith & Herberth, LLC
8905 Lake Avenue, Fourth Floor
Cleveland, Ohio    44102


**ATTORNEY FOR APPELLEES**

William T. Wuliger
The Brownell Building
1340 Sumner Court
Cleveland, Ohio    44115


MARY J. BOYLE, P.J.:

{¶ 1}  Plaintiff-appellant, John Sivinski, appeals several decisions of the trial court arising from his jury trial, wherein the trial court granted a directed verdict in favor of defendant-appellee, Lynn Arko Kelley ("Lynn"), in her individual and representative capacity as the executrix of the estate of Michael Kelley (collectively "the Estate"), on all of Sivinski's claims and denied Sivinski's motion for directed verdict on the Estate's counterclaims for

spoliation of the evidence and abuse of process. He further appeals from the jury's verdict, awarding the Estate $600,000 on its counterclaims, which included an award of punitive damages, and the trial court's additional award of attorney fees for $296,352.01. Finding some merit to the appeal, we reverse the trial court's denial of Sivinski's motion for directed verdict on the two counterclaims, thereby vacating the jury's award of damages and attorney fees, but affirm the trial court's granting of the Estate's motion for directed verdict on all of Sivinski's claims.

Procedural History and Background

{¶ 2} In 1997, Michael Kelley ("Kelley"), who was a nationally known attorney in the field of asbestos litigation, started a law practice with a well-established Florida asbestos lawyer, James Ferraro. Together they formed the partnership of Kelley & Ferraro, LLP ("K&F") in June 1997. Under the partnership agreement, each received 50 percent of the partnership's "distributable net earnings." And although the partnership agreement allowed for the addition of new equity partners (with the written consent of both Kelley and Ferraro), Ferraro's 50 percent equity in the business was never to decline.

{¶ 3} In June 1997, Kelley, who worked with Sivinski at Kelley's prior employment, recruited Sivinski to join him in the new firm. Sivinski agreed and executed a contract, titled 1997 Agreement ("1997 Agreement"), which, among other things, set forth the terms of Sivinski's compensation and his employment with K&F. Specifically, under the 1997

Agreement, Sivinski was to be paid a set salary but, effective January 1, 1998, he was to be compensated as an "equity partner" from the proceeds due Michael Kelley under the partnership agreement of K&F. Under the 1997 Agreement, Sivinski was entitled to an increasing percentage of the profits due Kelley (less Sivinski's base salary of $225,000) until 2001.

{¶ 4} According to Sivinski's trial testimony, Kelley later approached him and discussed modifying the terms of his compensation so that Ferraro would have to contribute to Sivinski's compensation, especially since Ferraro had been requiring Sivinski's assistance for trials in Florida. Sivinski admits signing a second employment agreement with K&F in 1999 ("1999 Agreement"). Under the 1999 Agreement, Sivinski would "continue to be a 'salaried partner' of K&F" for at least three years (2000-2002), but instead of a bonus calculated as a percentage of profits, the amount of his bonuses was specifically set out in the agreement.

{¶ 5} Sivinski testified, however, that the 1999 Agreement did not govern his compensation because Kelley told him that there was "no deal" as a result of Ferraro's refusal to accept the terms. Sivinski maintained that he never received a copy of this agreement and that it was understood that the 1997 Agreement still governed his compensation and employment.

{¶ 6}   He further testified that in 2004, he suspected that he was not being properly compensated under the 1997 Agreement because he did not receive an end of the year bonus, despite 2003 being an extremely profitable year for the law firm.   Shortly thereafter, on July 31, 2004, Kelley's son was involved in a tragic car accident, which Sivinski claimed prevented him from addressing his compensation issue with Kelley.   According to Sivinski, he did not want to bother Kelley while he was coping with his son's health conditions.

{¶ 7}   On January 1, 2006, Kelley died suddenly.   Lynn testified that, following her husband's death, Ferraro almost immediately locked her out of the firm and refused her access to Kelley's files, including a copy of the partnership agreement or any K&F records relating to Sivinski's contract terms.   Soon thereafter, Lynn, acting as the executrix of Kelley's Estate, commenced litigation against Ferraro and K&F, seeking, among other things, to enforce Kelley's rights under the partnership agreement.   See *Kelley v. Ferraro*, CV-589040 ("*Kelley I*").

{¶ 8}   Prior to filing the underlying suit, Sivinski approached Ferraro and presented him with a copy of the 1997 Agreement, claiming that the firm owed him money under this contract.   Ferraro, who did not have a high opinion of Sivinski, denied that Sivinski was owed any money.

{¶ 9}   Thereafter, in June 2007, Sivinski commenced the underlying action against Lynn, individually and in her capacity as the executrix of the Estate,   James Ferraro, and

K&F, alleging that he was not properly compensated under his employment agreement. He sought declaratory judgment and an accounting of the partnership; he further alleged claims for breach of contract, unjust enrichment, breach of fiduciary duty, and conversion. In support of his claims, Sivinski attached a copy of the 1997 Agreement to the complaint, executed between himself and K&F, setting forth the terms of his compensation.

{¶ 10} Ferraro and K&F jointly filed an answer, counterclaims, and asserted cross-claims against the Estate for indemnity, unjust enrichment, and breach of fiduciary duty. The Estate answered the complaint, denying that the 1997 Agreement was legally binding, and asserted eight counterclaims against Sivinski: (1) tortious interference with business relationships and/or contractual rights; (2) civil conspiracy; (3) abuse of process; (4) breach of contract; (5) breach of fiduciary duties; (6) fraud; (7) aiding and abetting; and (8) spoliation of evidence. They further asserted cross-claims against Ferraro and K&F.

{¶ 11} Prior to trial, Sivinski dismissed his claims against Ferraro and K&F without prejudice, who in turn also dismissed their counterclaims and cross-claims. The Estate also dismissed their cross-claims against Ferraro and K&F. The matter proceeded to a jury trial on Sivinski's claims and the Estate's counterclaims.

{¶ 12} At the close of Sivinski's case, Sivinski dismissed his conversion claim, and the trial court granted a directed verdict in favor of the Estate on the remaining claims. The case proceeded on the Estate's counterclaims.

{¶ 13} In contrast to Sivinski's version of the events, the Estate contended that the 1999 Agreement modified the terms of Sivinski's compensation, rendering his claims without merit. The Estate presented evidence that Kelley was not satisfied with Sivinski's performance and therefore wanted to modify his compensation. It further maintained that Sivinski actively concealed the existence of the 1999 Agreement, knowing that the Estate had no access to the document, given that Ferraro had locked Lynn out of the firm. The Estate also presented evidence that Sivinski denied the existence of any modifications of the 1997 Agreement in his discovery responses. And although the Estate ultimately obtained a copy of the 1999 Agreement, it did not receive it until almost three years into this case. Sivinski, however, was not the party to produce the document. James Ferraro testified that, after Sivinski's suit was filed, a copy of the 1999 Agreement was later located in the K&F files.

{¶ 14} The Estate further produced evidence of the attorney fees incurred as a result of the litigation relating to Sivinski's alleged underpayment.

{¶ 15} At the close of its evidence, the Estate dismissed its breach of fiduciary duty claim, and the trial court granted a directed verdict to Sivinski on the Estate's remaining counterclaims except for the abuse of process and spoliation of the evidence claims. The jury returned a verdict in favor of the Estate on these two claims, awarding $100,000 in compensatory damages on each claim, $400,000 in punitive damages, and further finding that

the Estate was entitled to recover attorney fees. The trial court subsequently held a hearing and awarded the Estate $296,352.01 for attorney fees.

{¶ 16} Sivinski appeals, raising 12 assignments of error, which are set forth in the attached appendix. We will address them together and out of order where appropriate.

## Directed Verdict

{¶ 17} In Sivinski's first, second, and eleventh assignments of error, he challenges the trial court's rulings as to the denial of his motion for directed verdict, as well as the trial court's grant of the Estate's motion for directed verdict on all of his claims.

{¶ 18} We review a trial court's decision regarding a motion for directed verdict de novo. *Schafer v. RMS Realty* (2000), 138 Ohio App.3d 244, 257, 741 N.E.2d 155. Civ.R. 50 sets forth the standard of granting a motion for directed verdict:

{¶ 19} "When a motion for directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to each party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

{¶ 20} In setting forth the standard for a directed verdict, the Ohio Supreme Court has recognized: "it is well established that the court must neither consider the weight of the evidence nor the credibility of the witnesses in disposing of a directed verdict motion. * * *

Thus, if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied." (Internal quotations and citations omitted.) *Wagner v. Roche Laboratories*, 77 Ohio St.3d 116, 121, 1996-Ohio-85, 671 N.E.2d 252. However, when the party opposing the motion has failed to produce any evidence on one or more of the essential elements of a claim, a directed verdict is appropriate. *Hargrove v. Tanner* (1990), 66 Ohio App.3d 693, 586 N.E.2d 141.

{¶ 21} With these foregoing principles in mind, we turn to Sivinski's assignments of error.

A. *Spoliation of the Evidence*

{¶ 22} In his first assignment of error, Sivinski argues that the trial court erred in denying his motion for a directed verdict on the Estate's spoliation of the evidence claim. He argues that there was no evidence to support all of the elements, and therefore the count should not have gone forward for the jury to consider. We agree.

{¶ 23} The Ohio Supreme Court has recognized the elements for a spoliation claim as follows: (1) pending or probable litigation involving the claimant; (2) the respondent's knowledge that litigation exists or is probable; (3) willful destruction of evidence by respondent designed to disrupt claimant's case; (4) actual disruption of claimant's case; and

(5) damages resulting therefrom. *Smith v. Howard Johnson*, 67 Ohio St.3d 28, 29, 1993-Ohio-229, 615 N.E.2d 1037.

{¶ 24} The Estate failed to satisfy the third element for a spoliation claim as there is no evidence that Sivinski destroyed or altered the 1999 Agreement. And while we recognize that the Estate presented evidence that Sivinski concealed the existence of the 1999 Agreement, this alone is insufficient to give rise to a spoliation claim. This court has consistently recognized that mere concealment or misrepresentation, without any factual allegation of destruction or alteration of evidence, is insufficient to state a claim for spoliation. See, e.g., *Bugg v. Am. Standard, Inc.*, 8th Dist. No. 84829, 2005-Ohio-2613; *O'Brien v. Olmsted Falls*, 8th Dist. Nos. 89966 and 90336, 2008-Ohio-2658.

{¶ 25} The Estate, however, relies on the Eleventh District's decision in *Drawl v. Cornicelli* (1997), 124 Ohio App.3d 562, 706 N.E.2d 849, in support of its claim that willful concealment is enough to support a spoliation claim. In *Drawl*, the court recognized "concealment" as a substitute for destruction or alteration of evidence to satisfy the third element of a spoliation claim as set forth by the Ohio Supreme Court in *Smith*. Id. at 568. But aside from directly conflicting with this court's precedent, *Drawl* is the minority view for such a proposition. Indeed, consistent with our precedent, other districts have refused to extend the *Smith* holding to cases where spoliation claims did not involve the destruction or alteration of physical evidence. See, e.g., *Tate v. Adena Regional Med. Ctr.*, 155 Ohio

App.3d 524, 2003-Ohio-7042, 801 N.E.2d 930 (Fourth Appellate District); *Pratt v. Payne*, 153 Ohio App.3d 450, 2003-Ohio-3777, 794 N.E.2d 723 (Second Appellate District); *Allstate Ins. Co. v. QED Consultants, Inc.*, 5th Dist. No. 09CA14, 2009-Ohio-4896, ¶19 (detailed list of Ohio cases refusing to extend the *Smith* holding to cases where the spoliation claim asserted does not involve the willful destruction or alteration of physical evidence).

{¶ 26} Accordingly, because the Estate failed to satisfy the third element for a spoliation claim, the trial court should have granted a directed verdict in favor of Sivinski on this claim. Indeed, a trial court has a duty "to withhold an essential issue from the jury when there is not sufficient evidence relating to that issue to permit reasonable minds to reach different conclusions on that issue." *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 220, 280 N.E.2d 896. See, also, Civ.R. 50(A)(4).

{¶ 27} The first assignment of error is sustained.

B. *Abuse of Process*

{¶ 28} In his second assignment of error, Sivinski argues that his motion for directed verdict on the Estate's abuse of process claim should have been granted.

{¶ 29} The tort of abuse of process has three elements: "(1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process." *Yaklevich v.*

*Kemp, Schaeffer & Rowe Co., L.P.A.*, 68 Ohio St.3d 294, 1994-Ohio-503, 626 N.E.2d 115, paragraph one of the syllabus. This tort developed to provide a remedy in situations where an appropriate legal procedure has been properly initiated, and even has ultimate success, but has been perverted to accomplish some ulterior motive for which a court proceeding was not intended. Id. at 297.

{¶ 30} We find Sivinski's argument that the Estate failed to establish the second element of the claim to be dispositive of this assignment of error.

{¶ 31} In order to show the process was perverted to accomplish an ulterior purpose, the Estate must show both an act committed during the process that was not proper in the normal conduct of the proceeding and Sivinski's ulterior motive. See *Ruggerio v. Kavlich*, 8th Dist. No. 92909, 2010-Ohio-3995. As recognized by the Ohio Supreme Court, "'[t]he improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club.'" *Robb v. Chagrin Lagoons Yacht Club, Inc.*, 75 Ohio St.3d 264, 271, 1996-Ohio-189, 662 N.E.2d 9, citing Prosser & Keeton on Torts (5 Ed.1984) 898, Section 121.

{¶ 32} The Estate contends that evidence of Sivinski's concealing the 1999 Agreement along with his dismissing "the only party with potential liability," i.e., K&F,

sufficiently satisfies the second element. We find, however, that this evidence fails to demonstrate an ulterior motive giving rise to an abuse of process claim.

{¶ 33} While the concealment of the 1999 Agreement clearly gives rise to a discovery violation, this evidence falls short of the ulterior motive necessary for an abuse of process claim; simply, the concealment was not an attempt to gain a collateral benefit outside of the process. To the contrary, such misconduct reveals an intent "to gain an objective contemplated by the process, i.e., succeeding in the lawsuit." *Wolfe v. Little* (Apr. 27, 2001), 2d Dist. No. 18718. And although such conduct is egregious and qualifies as an improper act, the absence of an "ulterior motive" defeats an abuse of process claim. Id.; see, also, *Grange Mut. Cas. Co. v. Klatt* (Mar. 18, 1997), 10th Dist. No. 96APE07-888.

{¶ 34} We likewise find that Sivinski's pursuit of his claims against the Estate, after having dismissed K&F — the alleged liable party on his claims — does not provide sufficient proof of an "ulterior motive" to satisfy an abuse of process claim. The gravamen of its argument is that Sivinski wrongfully continued to pursue his claims against the Estate, the most vulnerable defendant, for the express purpose of forcing it to pay money and satisfy the debt of another. The primary thrust of its claim is that Sivinski was improperly trying to extort money from the Estate when he discovered that his claims no longer had any merit. While such an argument may be a basis for sanctions under Civ.R. 11 or R.C. 2323.51, the

frivolous conduct statute, it does not satisfy the second element for an abuse of process claim.

{¶ 35} In determining whether "an ulterior motive" element is satisfied, the critical inquiry is whether the plaintiff is using the court proceeding to obtain a benefit or remedy against the defendant "that which the court is itself powerless to order in the proceeding." *Robb* at 271. For example, in *Robb*, the Ohio Supreme Court found that the plaintiffs' filing of lawsuits against a _yachting club to coerce members to vote in their favor could be construed as proof of an ulterior motive to overcome summary judgment. Id. In reaching this conclusion, the court recognized that there was proof that the underlying lawsuit was being used to accomplish a purpose that the trial court had no authority to grant. As stated by the court, "Clearly, the trial court had no authority to order club members how to vote." Id.

{¶ 36} Thus, the ulterior motive contemplated by an abuse of process claim generally involves an attempt to gain an advantage outside the proceeding, using the process itself as the threat. *Wolfe*, supra (noting typical ulterior purposes as "extortion of money, prevention of a conveyance, compelling someone to give up possession of something of value, when these things were not the purpose of the suit").

{¶ 37} Conversely, abuse of process does not occur when a party uses the court to pursue a legal remedy that the court is empowered to give. *Ruggerio*, supra; *Havens-Tobias*

*v. Eagle*, 2d Dist. No. 19562, 2003-Ohio-1561. And the mere fact that the claim is determined to be without merit does not give rise to an abuse of process claim. *Ruggerio* at ¶39-40.

{¶ 38} Further, while the Estate argues that Sivinski's pursuit of his claims, which it contends were meritless and made in bad faith, is enough to satisfy the second element of an abuse of process claim, this court has consistently rejected such an argument. See, e.g., *Tilberry v. McIntyre* (1999), 135 Ohio App.3d 229, 733 N.E.2d 636; *Ruggerio*, supra; *Kavlich v. Hildebrand*, 8th Dist. No. 91489, 2009-Ohio-1090. Indeed, "[i]t is well-settled * * * that a threat to pursue a civil action, even if the action would be entirely frivolous or brought in bad faith, does not constitute extortion." *Tilberry* at 241. Finally, "there is no liability for abuse of process where defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Yaklevich* at 298.

{¶ 39} Here, we simply find no evidence that Sivinski abused the legal process to accomplish an ulterior motive. His motive from the inception of the case has been to recover money under a contract, which is the very subject of this suit. Sivinski has maintained since the filing of the suit that he is entitled to payment against the Estate under the 1997 Agreement. If Sivinski had been successful, the trial court would have had the power to award him the remedy that he was seeking. And even though Sivinski failed on his claims, and the trial court found that the 1997 Agreement was superceded by the 1999

Agreement, an agreement that Sivinski denied existed, we still cannot say that an abuse of process claim lies.

**{¶ 40}** The second assignment of error is sustained.

C. *Sivinski's Claims: Declaratory Judgment, Breach of Contract, Unjust Enrichment, and Breach of Fiduciary Duty*

**{¶ 41}** In his eleventh assignment of error, Sivinski argues that the trial court erred in granting the Estate's motion for directed verdict as to his claims. He contends that reasonable minds could have reached different conclusions as to whether he was entitled to compensation under the 1997 Agreement. He specifically contends that he presented evidence to counter the Estate's claim that Kelley signed the agreement only in a representative capacity. He further contends that, based on the trial court's ruling in *Kelley I*, the original partnership agreement that created K&F is not valid and therefore, Kelley is solely liable on the contract. We find his arguments lack merit.

**{¶ 42}** First, Sivinski ignores that the trial court entered a directed verdict on his breach of contract, accounting, and declaratory judgment claims, after determining that, as a matter of law, the 1999 Agreement was a valid, superceding agreement. Sivinski offers no argument countering this legal determination. See App.R. 16(A)(7). His arguments as to why the jury may have reached different conclusions as to his rights under the 1997 Agreement are therefore irrelevant.

{¶ 43} But even applying the 1997 Agreement, we find that Sivinski's arguments fail as a matter of law. Before considering any outside evidence, a court must first look to the plain language of the agreement to determine the intent of the parties. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 53, 544 N.E.2d 920. "If a contract is clear and unambiguous then its interpretation is a matter of law and there is no issue of fact to be determined." *Inland Refuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.* (1984), 15 Ohio St.3d 321, 322, 474 N.E.2d 271. The clear and unambiguous language of the 1997 Agreement sets forth that the contract was executed between Sivinski and K&F — not Michael Kelley. Indeed, the only identified parties of the agreement are K&F and Sivinski. Further, Sivinski's primary obligation under the contract was to "devote to K&F all his time, attention, knowledge and skill to the practice of law and development of business for and to the benefit of K&F while employed by K&F * * *." He owed no obligations to Kelley, individually, under the agreement. And although Kelley signed the agreement, he did so in a representative capacity — his signature is underneath "Kelley & Ferraro, L.L.P.," preceded by the word "by." Thus, even assuming that Sivinski had not been properly compensated under the 1997 Agreement, his claim would lie against K&F — not Kelley individually. See *Stuart v. Natl. Indem. Co.* (1982), 7 Ohio App.3d 63, 67, 454 N.E.2d 158.

{¶ 44} We likewise find that the trial court properly entered a directed verdict on Sivinski's breach of fiduciary duty. Although Sivinski claimed that he was an "equity partner," thereby giving rise to his breach of fiduciary duty claim, he failed to present sufficient evidence to support this assertion. Conversely, the evidence submitted, including the partnership agreement and even the 1997 Agreement, belies his very claim. Under the partnership agreement, Michael Kelley and James Ferraro are the only two equity partners of K&F. And under the 1997 Agreement, Sivinski was "admitted as a 'salaried partner' of K&F," and that, while he was to be "compensated as an equity partner," said compensation was merely a "salary arrangement," which remained in effect only while Sivinski was employed by K&F. The 1997 Agreement further provided that Sivinski's salary was to be paid from Kelley's portion of the law firm's profits. Thus, as recognized by the trial court, "there is no inference that a person is a partner if he receives a portion of the partnership profits as a salary [under the Ohio's Uniform Partnership Act]." See R.C. 1775.06(D)(2).

{¶ 45} Finally, Sivinski's unjust enrichment claim fails as a matter of law because his compensation was expressly governed by contract. See *Ullman v. May* (1947), 147 Ohio St. 468, 72 N.E.2d 63, paragraph four of the syllabus; *Metz v. Am. Elec. Power Co., Inc.*, 172 Ohio App.3d 800, 811, 2007-Ohio-3520, 877 N.E.2d 316 (recognizing that, in the absence of fraud or bad faith, unjust enrichment is an alternative claim that is available only when there is no valid, controlling contract between the parties). As pointed out by the Estate, Sivinski

never disputed that a valid contract governed his compensation — he merely disputed which one.

{¶ 46} The eleventh assignment of error is overruled.

Collateral and Judicial Estoppel

{¶ 47} In his third assignment of error, Sivinski argues that the trial court erred in refusing to apply the doctrines of collateral and judicial estoppel. He contends that, pursuant to these doctrines, the Estate should have been barred from relying on the partnership agreement in the proceedings below when it had allegedly argued in a separate action, i.e., *Kelley I*, that the same was invalid — a position accepted by the trial court in *Kelley I*. We disagree.

{¶ 48} "The doctrine of judicial estoppel forbids a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding. Courts apply judicial estoppel in order to preserve the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposing to suit an exigency of the moment. The doctrine applies only when a party shows that his opponent: (1) took a contrary position; (2) under oath in a prior proceeding; and (3) the prior position was accepted by the court." (Internal quotations and citations omitted.) *Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 2007-Ohio-6442, 879 N.E.2d 174, ¶25.

{¶ 49} Conversely, to be successful in a claim of collateral estoppel, a party must prove the following four elements: "(1) The party against whom estoppel is sought was a party or in privity with a party to the prior action; (2) There was a final judgment on the merits in the previous case after a full and fair opportunity to litigate the issue; (3) The issue must have been admitted or actually tried and decided and must be necessary to the final judgment; and (4) The issue must have been identical to the issue involved in the prior suit." *Monahan v. Eagle Picher Industries, Inc.* (1984), 21 Ohio App.3d 179, 180-181, 486 N.E.2d 1165.

{¶ 50} We find Sivinski's assignment of error to be unpersuasive. First, we do not agree that the Estate took a contrary position in *Kelley I* to invoke the doctrine of judicial estoppel. See *Kelley v. Ferraro*, 8th Dist. No. 92446, 2010-Ohio-4179 (en banc decision recognizing that neither Lynn Kelley nor the Estate abandoned their position that the partnership agreement was a valid contract). Moreover, this court has recognized that the partnership agreement at issue in *Kelley I* was a valid and enforceable agreement. See *Kelley v. Ferraro*, 188 Ohio App.3d 734, 2010-Ohio-2771, 936 N.E.2d 986.

{¶ 51} Accordingly, neither doctrine is applicable, and the third assignment of error is overruled.

<u>Moot</u>

**{¶ 52}** Based on our disposition of the foregoing assignments of error, Sivinski's remaining eight assignments of error are rendered moot and will not be addressed.   See App.R. 12(A)(1)(c).

**{¶ 53}** In summary, we find that the trial court should have granted a directed verdict on the spoliation and abuse of process claims.   We therefore vacate the damages award rendered against Sivinski on these claims and vacate the award of attorney fees stemming from the jury's verdict.   We otherwise affirm the trial court's judgment granting a directed verdict in favor of the Estate on all of Sivinski's claims.

Judgment affirmed in part, reversed in part, and remanded to the lower court for further proceedings consistent with this opinion.

It is ordered that appellees and appellant share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


MARY J. BOYLE,   PRESIDING JUDGE

JAMES J. SWEENEY, J., CONCURS;
COLLEEN CONWAY COONEY, J., CONCURS IN PART

AND DISSENTS IN PART WITH SEPARATE OPINION

COLLEEN CONWAY COONEY, J., CONCURRING IN PART, DISSENTING IN PART:

{¶ 54} I concur with the majority opinion except for its reversing the jury's verdict on the spoliation claim in the first assignment of error. I would affirm the jury verdict and the award of damages and attorney fees related to this claim.

{¶ 55} Sivinski commenced this case after his law partner died suddenly. He claims he should have received a directed verdict on the spoliation claim because he did not have possession of his 1999 Agreement, did not destroy it, and a copy of the contract was available at trial. He brought suit in 2007 alleging he was underpaid pursuant to his 1997 Agreement, which by its terms covered his compensation at the law firm from 1998-2001. He admitted signing a second agreement in 1999 that changed his compensation and specifically set out his bonus structure for 2000-2002. When he first suspected that he had not received proper compensation because he did not receive the end-of-the-year bonus for 2003, he said nothing for the first seven months of 2004. He claims he did not raise the issue after the July 31, 2004 car accident because that would have been insensitive. He waited until Michael Kelley died to raise the issue.

{¶ 56} First of all, Sivinski initiated a breach of contract action knowing that the contract he was suing under was superceded by a second agreement. When asked during

discovery for any document modifying his original contract, he represented that "None exist."

Sivinski also lied about the existence of the second contract during his deposition until he was confronted with a copy bearing his signature. This evidence is sufficient to prove spoliation because it demonstrates that Sivinski knew of probable or pending litigation against Lynn Kelley (he filed the suit against her and the Estate), he destroyed the original contract, which disrupted her defense of his claims, and caused Kelley to incur substantial legal fees.

{¶ 57} There is circumstantial evidence from which a jury could have concluded that Sivinski destroyed the original copy of his 1999 Agreement, which was signed by both Sivinski and Michael Kelley. Ferraro testified that Kelley executed a copy of the 1999 Agreement but he could not locate the copy signed by Kelley in the Kelley & Ferraro files. This evidence, when considered together with Sivinski's act of suing on the 1997 Agreement and denying the existence of the 1999 Agreement, strongly suggests he destroyed the copy signed by Michael Kelley.[1] Because the jury should have been given the opportunity to weigh this evidence, I find the trial court properly denied the motion for a directed verdict.

{¶ 58} As Ohio Supreme Court noted in *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 650, 635 N.E.2d 331: "we have recently held that '[a] cause of action exists in tort for interference with or destruction of evidence * * *.' *Smith v. Howard Johnson*

---

[1]Curiously, Sivinski had a copy of his 1997 Agreement. Perhaps the jury found it incredible that a lawyer would not have a copy of his second/current contract.

*Co., Inc.* (1993), 67 Ohio St.3d 28, 29, 615 N.E.2d 1037, 1038." The *Moskovitz* court found the doctor's alteration of records exhibited a total disregard for the law. The court held that the evidence adduced at trial — the copy of page seven of the doctor's office chart recovered from the radiation department — fully supported an award of punitive damages. Id. at 652.

{¶ 59} And the dissent in *Moskovitz* fully supports my position as well.[2] Justice Wright stated:

{¶ 60} "My major concern with the majority's opinion is its treatment of the facts surrounding the *alleged* spoliation. I agree with the suggestion in the majority's opinion that if 'records were altered, destroyed or concealed by Dr. Figgie in an effort to conceal his medical negligence,' an award of punitive damages may be justified in a separate cause of action. However, the question whether Dr. Figgie 'altered certain records to conceal the fact that malpractice occurred' was a hotly disputed issue at trial, an issue vigorously rebutted with lengthy testimony by Dr. Figgie and his nurse. As is true with the determination of any significant fact, it was the province of the jury to make a finding and return a verdict on the issue of the alleged spoliation of evidence. Such a determination is *not* our task." (Emphasis in original.) Id. at 667-668.

---

[2]Justice Wright dissented in part due to the lack of any claim or jury instruction for spoliation.

{¶ 61} As the majority correctly notes, when ruling on a directed verdict motion, the court must neither consider the weight of the evidence nor the credibility of witnesses. If there is substantial competent evidence to support the nonmoving party, upon which evidence reasonable minds might differ, the motion should be denied.

{¶ 62} Here, we have substantial circumstantial evidence demonstrating a second agreement was entered for 2000-2002, pursuant to which Sivinski was paid. He made no objection to the alleged underpayment until years later, after the other signatory to the agreement had died. Since it was not the role of the trial court to weigh this evidence or judge witness credibility, the court properly denied the motion for directed verdict. Therefore, I would affirm this portion of the judgment.

## APPENDIX

I. "The Trial Court Committed Prejudicial Error by Failing to Grant Appellant's Motion for a Directed Verdict and by Allowing Appellee's Spoliation Claim to go to the Jury."

II. "The Trial Court Committed Prejudicial Error by Denying Appellant's Motion for a Directed Verdict and Allowing Appellee's Abuse of Process Claim to go to the Jury."

III. "The Trial Court Committed Prejudicial Error in Denying Appellant's Motion for Collateral and Judic[i]al Estoppel to the Legal Effect of the K & F Partnership Agreement."

IV. "The Trial Court Committed Prejudicial Error by Allowing the Issue of Damages to go to Jury because there was no Competent, Credible Evidence of Damages."

V. "The Trial Court Committed Prejudicial Error by Making Inappropriate and Grossly Prejudicial Comments Regarding Appellant, because these Comments Improperly and Unfairly Influenced the Jury."

VI. "The Trial Court Abused its Discretion when it did not find that the Jury's Award of Punitive Damages was Erroneous, even though it was Contrary to Law because the Jury's Verdict Awarded Punitive Damages but did not Award Compensatory Damages."

VII. "The Trial Court Abused its Discretion when it Ordered the Jury to Return to Deliberations to Correct a Jury Verdict, which on its Face, was contrary to Law."

VIII. "The Closing Argument of Appellee's Counsel Constituted Blatant Misconduct which resulted in Damage Award Improperly Based Upon Passion and Prejudice."

IX. "The Trial Court Erred in Making Numerous, Improper Evidentiary Rulings, which were Highly Prejudicial, and therefore, Constitute Prejudicial Error."

X. "The Trial Court Committed Prejudice Error in Awarding Attorneys' Fees as they were Duplicated and Otherwise Improper."

XI. "The Trial Court Committed Prejudicial Error by Granting Appellee's Motion for a Directed Verdict on Appellant's Claims for Declaratory Judgment, Breach of Contract, Unjust Enrichment and Breach of Fiduciary Duty."

XII. "The Trial Court Committed Prejudice Error by Failing to Provide the Jury with the Exhibits of Appellee During its Deliberation."